Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| ALAN THODORE RIZER<br><br>Apelado<br><br>v.<br><br>EDDA GLORIA SUSTACHE PEÑA, JUAN MANUEL MARTÍNEZ SUSTACHE, CHRISTIAN MARTÍNEZ SUSTACHE<br><br>Apelantes | TA2025AP00233 | APELACIÓN<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2022CV02529 (703)<br><br>Sobre: Incumplimiento de Contrato |

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 11 de mayo de 2026.

Comparece ante nos la señora Edda Gloria Sustache ("Sra. Sustache"), el señor Juan Manuel Martínez Sustache y el Sr. Christian Martínez Sustache ("Apelantes" o "Parte Apelante"), mediante *Apelación* presentada el 13 de agosto de 2025. Nos solicitan la revocación de la *Sentencia* emitida el 27 de junio de 2025, y notificada el 30 de junio de 2025, por el Tribunal de Primera Instancia, Sala Superior de Bayamón ("foro primario", "foro *a quo*" o "tribunal sentenciador"). Por virtud del referido dictamen, el foro primario declaró *Con Lugar* la causa de acción sobre incumplimiento contractual incoada por el señor Alan T. Rizer ("Sr. Rizer", "Parte Apelada" o "Apelado").

Por los fundamentos que expondremos a continuación, **modificamos** la *Sentencia,* y así modificada, **confirmamos**.

## I.

**En aras de facilitar una cabal comprensión sobre la controversia que nos ocupa, conviene brindar una relación de hechos detallada respecto al tracto procesal que rodea al caso de epígrafe.**

Surge del expediente ante nos que, el 16 de mayo de 2022, el Sr. Rizer instó *Demanda* sobre incumplimiento contractual en contra de la Parte Apelante.[1] En síntesis, alegó que los demandados, aquí Apelantes, incumplieron con el contrato de compraventa suscrito el 9 de octubre de 2020. Adujo que, en virtud de dicho contrato, aceptó comprar la propiedad en las condiciones en que se encontraban, mientras que la Sra. Sustache y su fenecido esposo, el Dr. Martínez, aceptaron vender la misma.[2] Según detalló en su reclamación, la compraventa se pactó por la suma de dos millones de dólares ($2,000,000.00). Precisó también que, mediante el referido contrato, ambas partes se comprometieron a actuar de forma diligente y en el mejor interés de completar la transacción, de surgir atrasos imprevistos.[3] De acuerdo con sus alegaciones, los vendedores tenían la obligación de entregar la propiedad libre de deudas y gravámenes, de conformidad con la cláusula sexta contenida en el arreglo contractual:

> *SELLERS will transfer to BUYERS the Property described above, free of any liens or debts, including but not limited to, Property taxes (CRIM), Homeowner's Association Dues, all electric and water charges accrued, etc. Transfer of property will be done according to Puerto Rico law.*[4]

---

[1] *Véase* SUMAC TPI, Entrada Núm. 1.

[2] *Véase* Exhibit 1 Estipulado, Entrada Núm. 228 SUMAC TPI. El contrato objeto del litigio establece lo siguiente:

> *The undersigned MANUEL MARTÍNEZ and EDDA SOUSTACHE [sic] ("the SELLERS")* **agree to sell**, *and the Undersigned ALAN THEODORE RIZER and MARIA GABRIELA CORDOBA ARIAS (the "BUYERS")* **agree to buy**, *the property located at 513 Tintillo Hills Road, Guaynabo, PR 00966 (the "Property").*
>
> *The BUYERS* **accept to buy the Property in "as is where is condition".**

[3] *Íd.* La cláusula 5 lee así: "Parties agree and understand that unforeseen delays may occur, **but that they will act diligently and in the best interest in completing the transaction**." (Énfasis suplido).

[4] SUMAC TPI, Entrada Núm. 228, Exhibit 1 Estipulado, Cláusula 6 del Contrato.

Sin embargo, el Apelado adujo que los vendedores incumplieron con el contrato al no comparecer a otorgar la Escritura de la Compraventa.[5] Al así hacerlo, sostuvo que incurrieron en dolo. En vista de lo anterior, solicitó al foro primario que ordenara el cumplimiento específico del contrato y le concediera una indemnización por los daños y perjuicios experimentados por causa del incumplimiento contractual. Igualmente, solicitó las costas y los honorarios de abogados.

Acto seguido, el Sr. Rizer presentó una *Urgente solicitud de orden de anotación preventiva de demanda bajo la Ley del Registro de la Propiedad Inmobiliaria de Puerto Rico* el 18 de mayo de 2022.[6] Ese mismo día, el foro *a quo* concedió la petición mediante *Orden*.[7] Transcurridos varios trámites procesales, los Apelantes comparecieron ante el foro primario mediante *Moción de Desestimación* el 28 de julio de 2022. En esencia, arguyeron que el foro *a quo* carecía de jurisdicción sobre sus personas, por defectos en los emplazamientos.[8] Evaluados sus argumentos, el tribunal sentenciador declaró *No Ha Lugar* su petición mediante *Orden* dictada el 28 de agosto de 2022.[9]

Continuados los procedimientos, los Apelantes presentaron *Contestación a Demanda* el 13 de septiembre de 2022.[10] En esta, adujeron que el contrato había sido novado, y que el comprador carecía de los fondos para realizar la compraventa. Además, alegaron que la transacción no se pudo completar, en primera instancia, por culpa del señor Rizer, y, en segundo lugar, porque el Departamento de Hacienda no emitió el Certificado de Cancelación de Gravamen ("Relevo de Cancelación de Gravamen").

---

[5] *Íd.,* pág. 11.
[6] SUMAC TPI, Entrada Núm. 10.
[7] SUMAC TPI, Entrada Núm. 12.
[8] SUMAC TPI, Entrada Núm. 25.
[9] SUMAC TPI, Entrada Núm. 28.
[10] SUMAC TPI, Entrada Núm. 32.

Tras varios trámites judiciales, el 15 de diciembre de 2022, los Apelantes presentaron *Solicitud de Órdenes y Vista sobre Embargo Preventivo*, mediante la cual, entre otras cosas, peticionaron al foro *a quo* que se celebrase una vista para dilucidar la procedencia de la anotación preventiva de embargo.[11] A su vez, requirieron la imposición del pago de una fianza, conforme a las Reglas de Procedimiento Civil.

Examinada su argumentación, el 24 de enero de 2023, el foro primario denegó —en corte abierta— la solicitud de los Apelantes durante la celebración de la Conferencia Inicial.[12]

Superada una serie de incidencias procesales, los Apelantes solicitaron permiso para presentar *Contestación enmendada a Demanda y Reconvención*.[13] En esta, alegaron, por primera vez, que el contrato de compraventa estaba sujeto a la aprobación de un *short sale* por el Banco Popular. A su vez, adujeron que la anotación preventiva de demanda les impedía vender la propiedad y saldar su deuda con el Banco Popular, quien les había demandado en cobro y ejecución de hipoteca. Específicamente, indicaron que "[l]a anotación de la demanda del pleito de epígrafe en el Registro de la Propiedad impide la venta de la propiedad para poder responder al Banco Popular de las reclamaciones en contra de la parte demandada y su propiedad inmueble".[14] En vista de ello, solicitaron dos millones doscientos mil dólares ($2,200,000.00), por razón de los ingresos dejados de recibir por la anotación de demanda ante el Registro de la Propiedad. También, peticionaron cien mil dólares ($100,000.00) en concepto de los gastos de los pleitos instados por

---

[11] SUMAC TPI, Entrada Núm. 53, págs. 1-2. Dicha moción también contenía peticiones relacionadas con el descubrimiento de prueba.
[12] SUMAC TPI, Entradas Núm. 61 y 62.
[13] SUMAC TPI, Entrada Núm. 66.
[14] *Íd.,* pág. 6.

el acreedor hipotecario, más la concesión de cien mil dólares ($100,000.00) por los daños y perjuicios experimentados.[15]

Seguidamente, el 8 de junio de 2023, los Apelantes radicaron *Moción de Desestimación de Desestimación por Incumplimiento con el Descubrimiento de Prueba y Anotación de Rebeldía*. En esta, solicitaron al foro primario que desestimara el pleito por incumplimiento con el descubrimiento de prueba, y requirieron, además, que se le anotase la rebeldía a la Parte Apelada, por no haber contestado la reconvención.[16]

Por su parte, el 23 de junio de 2023, el señor Rizer radicó *Oposición a Moción de Desestimación y Anotación de Rebeldía y Solicitud de Breve Prórroga para Presentar Alegación Responsiva*.[17] No obstante, el foro *a quo* dictó *Orden,* en la cual declaró *No Ha Lugar* la petición de desestimación sometida por los Apelantes.[18] En consecuencia, dispuso que "tiene la parte demandante 3 días para hacer alegación responsiva sobre la Reconvención, so pena de anotar la rebeldía".[19]

Así las cosas, el 26 de junio de 2023, el Apelado solicitó una *Moción de Desestimación de la Reconvención*.[20] No obstante, el foro primario declaró *No Ha Lugar* tal petición en virtud de la *Orden* emitida el 18 de julio de 2023.[21]

Mientras el foro *a quo* consideraba las mociones dispositivas sobre la reconvención presentada, el señor Rizer solicitó que se emitiera una orden al Departamento de Hacienda para que le suministrara una copia de la Planilla Final de Contribución sobre Caudal Relicto concerniente a los bienes de la Sucesión de Manuel José Martínez Colón, así como del Certificado de Cancelación de

---

[15] *Íd.,* pág. 7.
[16] SUMAC TPI, Entrada Núm. 72.
[17] SUMAC TPI, Entradas Núm. 74
[18] SUMAC TPI, Entradas Núm. 75.
[19] *Íd.*
[20] SUMAC TPI, Entrada Núm. 76.
[21] SUMAC TPI, Entrada Núm. 94.

Gravamen emitido conforme a la Sección 2054.02 del Código de Rentas Internas, así como del Certificado de Cancelación de Gravamen emitido conforme a la Sección 2054.02 del Código de Rentas Internas, Ley Núm. 1-2011, según enmendada, 13 LPRA sec. 31162.[22]

En desacuerdo, los Apelantes sometieron la *Oposición a Solicitud de Orden y Solicitud de Orden Protectora*, en la que alegaron que la petición sometida por el señor Rizer era irrelevante, pues versaba sobre documentos confidenciales, por lo cual, no procedía su expedición.[23] Asimismo, solicitaron un término para peticionar ante el Departamento de Hacienda una certificación negativa cancelación de gravamen contributivo.

Evaluados sus respectivos argumentos, el 7 de julio de 2023, el foro primario acogió la petición del Apelado. Consecutivamente, emitió *Orden,* mediante la cual requirió que el Departamento de Hacienda produjera las certificaciones solicitadas en cuanto al caudal relicto, así como la expedición del certificado de cancelación de gravamen.[24]

Así las cosas, y posterior a varios trámites procesales, los cuales incluyeron la presentación de una petición de *certiorari* ante este foro intermedio, ambas partes presentaron mociones de sentencia sumaria. Tras examinar sus respectivas solicitudes, el foro *a quo* dictó *Resolución* emitida el 23 de mayo de 2024. Mediante dicho dictamen, el tribunal formuló ciertas determinaciones de hechos incontrovertidos, y en su consecuencia, ordenó la celebración de un juicio para dirimir aquellos hechos que están controversia.

---

[22] SUMAC TPI, Entrada Núm. 77.
[23] SUMAC TPI Entrada Núm. 88.
[24] SUMAC TPI Entrada Núm. 89.

En desacuerdo, los Apelantes presentaron *Moción de Reconsideración* el 7 de junio de 2024. Sin embargo, en igual fecha, el tribunal sentenciador emitió *Orden*, mediante la cual declaró *No Ha lugar* su solicitud. Inconformes, estos acudieron ante este foro intermedio y al Tribunal Supremo de Puerto Rico mediante solicitudes de *certiorari*, las cuales fueron denegadas.

Acontecidas tales incidencias procesales, el foro *a quo* celebró juicio los días 19 y 20 de mayo de 2025. A este proceso, comparecieron como testigos de la Parte Apelada las siguientes personas: el señor Rizer, y la señora Nicole Franceschini, quien es la corredora de bienes raíces contratada por el demandante, aquí, Apelado. Por su parte, los Apelantes presentaron el testimonio de la Sra. Sustache. Una vez sometido el caso, estos desistieron con perjuicio de la *Reconvención*.[25]

Evaluada la prueba oral y testifical desfilada durante la celebración del juicio, el foro primario dictó *Sentencia* el 27 de junio de 2025, notificada el 30 de junio de 2025, en la cual declaró *Con Lugar* la *Demanda* por incumplimiento contractual. En virtud del referido dictamen, el foro primario formuló las siguientes determinaciones de hechos:

1. El demandante Sr. Alan T. Rizer obtuvo un bachillerato en finanzas y matemáticas de la Universidad de Miami en el año 2007.

2. El señor Rizer está casado bajo el régimen de separación de bienes con la Sra. María Gabriela Córdova.

3. El señor Rizer se mudó a Puerto Rico en o alrededor del mes de abril de 2018 debido a que el primer idioma de su esposa es el español y buscaban empezar una familia en un lugar donde pudieran disfrutar de la playa, el clima y la cultura latina.

4. La codemandada Sra. Edda Sustache Peña tiene un bachillerato en ciencias y maestrías e biología y administración de negocios con concentración de servicios de salud.

---

[25] SUMAC TPI Entrada Núm. 236 ("Culminado el turno de prueba de la parte demandada, se dio por sometido el asunto. El licenciado Baralt Suárez [Apelados] manifestó que la parte demandante reconvenida interesa adjuntar una moción y amentarla bajo la Regla 39.2, esto en cuanto a la reconvención. El licenciado Méndez Solís [Apelantes] manifestó en cuanto a la solicitud de la parte demandante que se allana y la retira".).

5. El codemandado Sr. Jua Manuel Martínez Sustache, hijo del Dr. Martínez Colón y la Sra. Sustache Peña, es experto en financiamiento e inversiones en propiedades de bienes raíces. Posee un bachillerato y maestría en Georgia Tech, así como una maestría en administración de empresas de la prestigiosa escuela de negocios Wharton de la Universidad de Pensilvania.

6. Como parte de sus trabajos relacionados a los bienes raíces, el codemandado Juan Manuel Martínez Sustache ha trabajado con Prisa Group, CPG Island Servicing, Carlyle Development Group, Crossman & Company, Courtelis, Aspen Heights Group, USA Real Estate Company y con Waypoint. Actualmente reside y trabaja en Texas.

7. El codemandado Juan Manuel Martínez Sustache ha trabajado como corredor de bienes raíces y obtuvo una licencia para ello.

8. El codemandado Sr. Christian Martínez Sustache, hermano de Juan Manuel Martínez Sustache e hijo del Dr. Martínez Colón y la Sra. Sustache Peña, es CPA, estudió finanzas y contabilidad en University of Miami. Además, tiene una maestría en auditoria de la universidad de FIU.

9. El codemandado Christian Martínez Sustache ha trabajado en bancos, firmas de finanzas que manejan préstamos y como auditor. Además, ha sido manejador de inversiones e inversionista profesional ("Day Trader").

10. El 29 de mayo de 1992, el doctor Manuel Martínez Colón y la Sra. Edda Sustache Peña adquirieron el inmueble localizado en 513 Tintillo Hills, Guaynabo, Puerto Rico como su residencia principal.

11. La descripción registral de la propiedad es: RÚSTICA: Predio de terreno radicado en el Barrio Juan Sánchez del término municipal de Bayamón, Puerto Rico, compuesto de dos punto cinco mil setecientos cuarenta y una cuerdas (2.5741) equivalentes a diez mil ciento diecisiete punto once metros cuadrados; en lindes por el NORTE, con los terrenos de Estados Unidos de América y terrenos de W.F. Ramson; por el SUR, con terrenos del licenciado Cruz Rosario; por el ESTE, con terrenos de Antonio Arias y Jan Pierre Segarra; y por el OESTE, con terrenos de Cornelius Conrad y camino municipal conocido como Calle Tintillo. Enclava en esta parcela una casa de residencia de planta y media de concreto armado con techo del mismo material, teniendo la planta baja garage para dos carros, un dormitorio con baño y laundry, y en la planta alta sala-comedor, dos dormitorios con dos baños y cocina.

La finca es la núm. 8437 inscrita al folio 161 del Tomo 276 de Bayamón Norte, Registro de la Propiedad de Bayamón, Sección Tercera.

12. El doctor Martínez Colón y su esposa, la señora Sustache Peña, decidieron poner a la venta la propiedad objeto de este litigio alrededor de dos años antes de que él falleciera.

13. El doctor Martínez Colón y su esposa querían vender la propiedad porque para ellos era un "dolor de cabeza" debido al alto costo de mantenimiento y porque el doctor estaba enfermo.

14. El doctor Martínez Colón y la señora Sustache Peña contrataron a la corredora de bienes raíces Sra. Ana Castañer, quien era su vecina y amiga, para ayudarlos a

vender la propiedad en 513 Tintillo Hills, Guaynabo, Puerto Rico.

15. En otoño de 2020, el señor Rizer y su esposa, Sra. María Gabriela Córdova, decidieron que querían comprar una residencia en el área de Guaynabo.

16. La Sra. Nicole Franceschini fue contratada por el Sr. Rizer y su esposa para asistirles en la búsqueda de una residencia familiar en Guaynabo, Puerto Rico.

17. El Sr. Rizer visitó por primera vez la propiedad en 513 Tintillo Hills, Guaynabo, a principios de octubre de 2020. En dicha visita, además del señor Rizer y su esposa, estuvieron presente su corredora de bienes raíces, la Sra. Nicole Franceschini, así como la corredora de bienes raíces de los vendedores, la Sra. Ana Castañer

18. **Al momento en que el Sr. Rizer visitó la propiedad, el precio de venta de esta era de $2,200,000.00.**

19. El señor Rizer describió la propiedad como la casa de sus sueños y pensó que era única por su vegetación, jardines, piscina, cancha de tenis y por tener vista a la bahía de San Juan y El Morro.

20. **El señor Rizer presentó una oferta de $1,900,000.00 para la compra de la propiedad. En reacción a la referida oferta, el doctor Martínez Colón y la señora Sustache Peña hicieron una contraoferta por la suma de $2,000,000, la cual fue aceptada por el señor Rizer**.

21. El 9 de octubre de 2020, el señor Rizer y su esposa, como compradores, y el doctor Martinez Colón y la señora Sustache Peña, como vendedores, suscribieron un contrato (en adelante, el "Contrato") para la venta de la propiedad en 513 Tintillo Hills, Guaynabo por la suma de $2,000,000.00.

22. De acuerdo con los términos del Contrato, las partes tendrían un término de 60 días, es decir, hasta el 9 de diciembre de 2020, para otorgar la escritura de compraventa.

23. En el referido Contrato otorgado el 9 de octubre de 2020, el doctor Martínez Colón y la señora Sustache Peña **se obligaron a vender la propiedad** en 513 Tintillo Hills, Guaynabo, mientras que el señor Rizer y su esposa **se obligaron a comprar la misma** en "as is, where is condition."

24. La parte vendedora se obligó a transferir la propiedad a la parte compradora libre de cargas, deudas y gravámenes.

25. Además, las partes acordaron que, de surgir algún retraso imprevisto, las partes actuarían diligentemente para finiquitar la transacción y otorgar la escritura de compraventa. En específico, el Contrato dispone que "[the] Parties agree and understand that unforeseen delays may occur, but that they will act diligently and in the best interest in completing the transaction."

26. **Asimismo, las partes pactaron que, en caso de que la parte compradora estuviese lista para otorgar la escritura de compraventa, pero la parte vendedora no lo hiciera, la parte compradora tendría el derecho a reclamar el cumplimiento específico del Contrato, así como un remedio de daños**:

If Buyers are ready, willing and able to execute the deed of sale and other closing documents and to pay the cash portion of the purchase price and other adjustments

provide[d] for above, but the Sellers do not execute the deed of sale, the Buyers shall have the right to specific performance of this contract plus damages, if any, or at their option, cancel this contract and receive the earnest money as total compensation. In either case, Sellers shall remain liable to pay the broker(s) the full commission provided herein.

27. En atención a la condición de salud del doctor Martínez Colón, quien ya estaba enfermo al momento de otorgar el Contrato, las partes negociaron expresamente y acordaron, como una condición esencial del Contrato, **que los términos de éste obligaban a los sucesores y herederos de las partes**. Para ello, el Contrato dispone en mayúsculas ("THIS IS A LEGALLY BINDING DOCUMENT AND IT SHALL INURE TO THE BENEFIT OF THE PARTIES HERETO, AND THEIR HEIRS, ADMINISTRATORS, SUCCESSORS, AND THEIR ASSIGNS.")

28. Además, se acordó que los términos estipulados en el Contrato comprendían la totalidad de los acuerdos entre las partes y que cualquier enmienda debía ser otorgada por escrito ("Once accepted this contract will constitute the entire agreement between the parties. No other verbal agreement will modify this contract and any change shall be submitted in writing.")

29. Aunque el primer borrador del Contrato otorgado por las partes el 9 de octubre de 2020 fue preparado por la parte vendedora, los términos de este fueron negociados por las partes.

30. **El Sr. Rizer entregó un depósito de $80,000.00 a la corredora de bienes raíces de los demandados, la Sra. Ana Castañer quien todavía lo tiene bajo su custodia.**

31. **El Contrato firmado el 9 de octubre de 2020 no tenía condiciones suspensivas**.

32. **El Contrato otorgado por las partes el 9 de octubre de 2020 no estaba condicionado a la aprobación de una transacción de "short-sale" por parte de Banco Popular de Puerto Rico**.

33. El señor Rizer y la señora Franceschini, como corredora de bienes raíces y representando al señor Rizer en la transacción, conocían que el Banco Popular de Puerto Rico había aprobado un "short-sale" de la propiedad a solicitud de los vendedores, pero desconocían los detalles de este y no formaron parte de las conversaciones con la entidad bancaria.

34. Para la fecha en que se otorgó el Contrato, el "short sale" había sido aprobado por el Banco Popular y tanto los compradores como los vendedores desconocían hasta que fecha estaría vigente esa aprobación.

35. **La expectativa del señor Rizer al momento de otorgar el Contrato era que, independientemente de la relación contractual entre el Banco Popular y los vendedores, estos honrarían el compromiso de entregar la propiedad libre de deudas, cargas y gravámenes**.

36. Luego de firmar el Contrato para la compra de la propiedad en 513 Tintillo Hills, Guaynabo, el señor Rizer comenzó a realizar las gestiones para obtener financiamiento para la compra de la propiedad con Banco Popular de Puerto Rico. Más tarde determinó utilizar los servicios de otra entidad, Preferred Mortgage, para este propósito.

37. El señor Rizer tenía el capital para comprar la propiedad sin financiamiento, pero prefería obtener una hipoteca por razones de negocio debido a que en ese momento los intereses hipotecarios eran históricamente bajos.

38. Durante el periodo de tiempo relevante a la compraventa entre el 2020 y el 2021, el señor Rizer tenía una cuenta de inversiones con acciones valoradas en cerca de $4,000,000.00 que podía vender de un momento a otro y convertir el capital en efectivo para cerrar la compraventa pactada en $2,000,000.00.

39. El 19 de octubre de 2020, las partes firmaron una enmienda al Contrato para eliminar a la esposa del Sr. Rizer, la Sra. María Gabriela Córdova, como parte compradora.

40. Alrededor de esa fecha, el señor Rizer y su esposa otorgaron una escritura de capitulaciones post-matrimoniales.

41. El 4 de diciembre de 2020, el señor Rizer y la señora Sustache Peña, ésta por sí y en representación del doctor Martínez Colón en virtud de un poder especial otorgado a su favor, otorgaron una enmienda al Contrato mediante el cual acordaron extender el término para otorgar la escritura de compraventa por 90 días adicionales.

42. El doctor Martínez Colón falleció el 28 de diciembre de 2020 en el estado de Texas. Sus únicos herederos son los aquí codemandados, la Sra. Edda Sustache Peña y sus hijos, los Sres. Christian y Juan Manuel Martínez Sustache, según surge de su Declaratoria de Herederos, emitida el 31 de marzo de 2021, en el caso núm. BY2021CV01191.

43. El 24 de febrero de 2021, el señor Rizer, la señora Sustache Peña, el Sr. Juan Manuel Martínez Sustache y el Sr. Christian Martínez Sustache suscribieron una enmienda al Contrato con el propósito de extender hasta el 7 de junio de 2021 el término para que las partes otorgaran la escritura de compraventa. **Además, los suscribientes de la referida enmienda al Contrato, a saber, el demandante y todos los codemandados, ratificaron y confirmaron todos los términos del Contrato** ("Except as expressly amended hereby, all of the terms and conditions of the Agreement are, as hereby amended, ratified and confirmed in all respects.")

44. **El 1ro de abril de 2021**, la señora Sustache Peña informó por medio de correo electrónico que, una vez recibieran la Resolución sobre Declaratoria de Herederos, su contable radicaría la Planilla Informativa de Caudal Relicto porque ya tenían en su poder toda la información necesaria para radicar dicha Planilla. Esa Planilla les permitiría obtener el Relevo de Hacienda necesario para cerrar la compraventa.

45. El 7 de mayo de 2021, la señora Franceschini cursó una comunicación por correo electrónico a la Sra. Castañer, informándole que Preferred Mortgage había aprobado un financiamiento hipotecario al señor Rizer para la compra de la propiedad y que, por parte de los compradores, estaban listos para cerrar la transacción y otorgar la escritura de compraventa.

46. El señor Rizer testificó, **y así este tribunal le mereció credibilidad**, que había obtenido el financiamiento para comprar la propiedad con una hipoteca en mayo de 2021, además de tener el capital disponible para comprarla sin financiamiento.

47. El 12 de mayo de 2021, el señor Rizer, la señora. Sustache Peña, el Sr. Juan Manuel Martínez Sustache y el Sr. Christian Martínez Sustache suscribieron una enmienda al Contrato con el propósito de extender hasta el 7 de agosto de 2021 el término para que las partes otorgaran la escritura de compraventa. **Nuevamente, los comparecientes ratificaron y confirmaron los demás términos del Contrato**.

48. El 1ro de junio de 2021 la señora Franceschini envió un correo electrónico a la señora Castañer con la carta de aprobación de Preferred Mortgage ("Here is the letter of approval from the bank") y solicitando se le actualice sobre la presentación de la Planilla Informativa de Caudal Relicto y la solicitud del Relevo de Hacienda.

49. Ese mismo día, la señora Castañer le envió por correo electrónico a la señora Franceschini copia de la enmienda al Contrato de 12 de mayo de 2021 firmada por los demandados. Además, le informó que esperaban recibir pronto el Relevo de Hacienda ("Hopefully we get the relevo soon.").

50. El 23 de junio de 2021, 78 días luego de que el tribunal emitiera la Resolución de Declaratoria de Herederos, la señora Franceschini le cursó un correo electrónico a la corredora de bienes raíces de los demandados, en el que le solicitó nuevamente una actualización sobre el estado del Relevo de Hacienda.

51. El 29 de junio de 2021, la señora Franceschini nuevamente le dio seguimiento a la señora Castañer en cuanto al Relevo de Hacienda y le ofreció los servicios de un gestor para que asistiera a los vendedores en el proceso de obtener el Relevo de Hacienda, con el propósito de poder lograr el cierre de la compraventa a la mayor brevedad posible, según pactado.

52. El 8 de julio de 2021, la señora Franceschini le dio seguimiento a la señora Castañer en relación con el Relevo de Hacienda y le solicitó una explicación en cuanto a las razones por las que el proceso ante el Departamento de Hacienda se estaba demorando tanto. Esto, con el propósito de poder lograr el cierre de la compraventa a la mayor brevedad posible, según pactado.

53. El 26 de julio de 2021, la señora Franceschini le informó, por medio de correo electrónico, a la señora Castañer que el señor Rizer se encontraba comprometido con finiquitar la transacción y le ofreció cualquier ayuda que necesitaran los vendedores para poder llevar a cabo la misma, con el propósito de poder lograr el cierre de la compraventa a la mayor brevedad posible, según pactado

54. El 3 de agosto de 2021, la señora Franceschini le informó a la señora Castañer que el señor Rizer estaba dispuesto a pagar por los servicios de un gestor para agilizar el proceso de los vendedores de obtener el Relevo de Hacienda ("As I mentioned, I have a contact for a "gestor", "facilitator", that might be able to help us moving forward. I am including the information below in the event that we wish to use the services. We are willing to pay for this, if the accountant finds that this could be useful."). Le reiteró, además, que el señor Rizer continuaba comprometido con cerrar la transacción ("And lastly, we just want to reaffirm our commitment to this process. We have made every effort to keep this moving forward and we are ready to help in any way we can.").

55. Para el 7 de agosto de 2021, fecha en la que vencía la enmienda al Contrato firmada por las partes, **el señor**

**Rizer se encontraba listo para cerrar la transacción y firmar la escritura de compraventa, y así se lo había informado a la parte vendedora y la señora Castañer en múltiples ocasiones, sin que los vendedores comparecieran al cierre de la compraventa.**

56. La señora Franceschini testificó, **y este tribunal así le dio credibilidad que**, además de los correos electrónicos, habló por teléfono con la señora Castañer y le solicitó que los demandados comparecieran al cierre de la compraventa.

57. Al 7 de agosto de 2021, el señor Rizer y la señora. Franceschini entendían que los vendedores habían solicitado el Relevo de Hacienda y que dicha solicitud se encontraba pendiente ante el Departamento de Hacienda.

58. Además, a esa fecha, el señor Rizer y la señora Franceschini entendían que, en cumplimiento con el Contrato, los vendedores estaban siendo diligentes para resolver la dilación imprevista de necesitar obtener el Relevo de Hacienda y, una vez obtenido, finiquitar la compraventa.

59. **Al 7 de agosto de 2021, ni los demandados ni la señora Castañer le habían informado al señor Rizer o a la señora Franceschini que el Relevo de Hacienda aún no se había solicitado al Departamento de Hacienda.**

60. Al 7 de agosto de 2021, los vendedores tampoco habían informado al señor Rizer que se necesitara de alguna aprobación adicional del Banco Popular de Puerto Rico para finiquitar la transacción.

61. En o alrededor del 26 de julio de 2021, el señor Rizer firmó una enmienda al Contrato con el propósito de extender hasta el 7 de octubre de 2021 el término para que las partes otorgaran la escritura de compraventa. La señora Sustache Peña, el Sr. Juan Manuel Martínez Sustache y el Sr. Christian Martínez Sustache también firmaron la referida enmienda. **No obstante, éstos añadieron por primera vez por separado un adendum indicando que el Contrato estaba sujeto a la aprobación del banco del "short-sale" de la propiedad por la suma de $2,000,000.00.**

62. **El señor Rizer no firmó el referido adendum por entender que esa condición nunca fue parte del Contrato**.

63. **El 15 de septiembre de 2021, la señora Sustache Peña le envió una comunicación a la señora Castañer dirigida al señor Rizer en la que le confirmó que ella y sus hijos interesaban finiquitar la transacción a la mayor brevedad y que informarían al señor Rizer tan pronto recibieran el Relevo de Hacienda que estaban supuestamente esperando** ("Please let Buyers know that it is to our Benefit to close this transaction as soon as possible. As soon as we have the papers from Hacienda we will notify the bank and the purchaser.").

64. El 27 de octubre de 2021, **la parte demandada comenzó por primera vez a realizar los trámites ante el Departamento de Hacienda en cuanto a la Planilla Informativa de Caudal Relicto con el fin de obtener el Relevo de Hacienda con relación al Dr. Manuel Martínez Colón**. No obstante, no completaron la solicitud requerida por el Departamento de Hacienda sino hasta el 20 de julio de 2023, catorce meses después de comenzado este pleito.

65. El 24 de noviembre de 2021, la señora Franceschini le envió un correo electrónico a la señora Castañer expresando su frustración ante la poca información que estaban recibiendo de parte de los vendedores en cuanto a la solicitud del Relevo de Hacienda y, una vez más, ofreciendo su ayuda e, incluso, cubrir los costos legales para agilizar el proceso ("It's been difficult for the buyers when there is very little information being shared with them so that they can understand where we are in this process. We would like to help, and would even be willing to assume the legal costs in order to help facilitate the process.").

66. **El 3 de diciembre de 2021, el señor Rizer, a través de su representación legal, envió una carta a los demandados reiterando su exigencia de que cumplieran con sus obligaciones contractuales y le vendieran la propiedad, e informaran una fecha hábil para otorgar la Escritura de Compraventa**.

67. La referida carta fue contestada por los demandados, por conducto de la Lcda. Mercybelle Redondo, el 13 de diciembre de 2021. En esta carta, los demandados asumieron **por primera vez** la postura de que el Contrato expiró el 8 de diciembre de 2020.

68. El señor Rizer se sorprendió por esta respuesta debido a que los demandados habían ratificado el Contrato y firmado varias enmiendas extendiendo su vencimiento durante el 2021.

69. El 25 de abril de 2022, el señor Rizer envió una carta a los demandados en la que, nuevamente, insistió en que se cumplieran las obligaciones contractuales y otorgaran la escritura de compraventa. El señor Rizer también se reiteró en su intención de evitar un pleito judicial a toda costa.

70. El 22 de octubre de 2022 y 22 de diciembre de 2022 el Banco Popular de Puerto Rico instó los pleitos de ejecución de hipotecas contra los demandados para el cobro de dinero de las hipotecas que gravan la propiedad. (Civil número BY2022CV05316, consolidado con BY2023CV02750 y BY2022CV06522).

71. El 20 de julio de 2023, los demandados finalizaron el proceso de radicación de la Planilla Informativa de Caudal Relicto ante el Departamento de Hacienda.

72. El 21 de julio de 2023, el Departamento de Hacienda emitió el Certificado de Cancelación de Gravamen Contributivo (Relevo de Hacienda) del doctor Martínez Colón.

73. De acuerdo con el testimonio del Sr. Rizer, **al cual este tribunal le brinda entera credibilidad**, luego de que los demandados recibieran el Relevo de Hacienda, este solicitó a través de su abogado que cumplieran con el Contrato y otorgaran la escritura de compraventa, pero estos le respondieron que no honrarían el precio de compraventa de $2,000,000.00 acordado en el Contrato y que el precio de compraventa ahora sería de $5,000,000.00. **Nótese que la parte demandada renunció a presentar el testimonio de los dos hijos del doctor Martínez para refutar este hecho. Tampoco fue refutado por la señora Sustache en su testimonio**.

74. Actualmente la señora Sustache Peña y el codemandado Sr. Christian Martínez Sustache residen en la propiedad objeto de este litigio. De hecho, la Sra. Sustache Peña ha vivido ininterrumpidamente en la propiedad por 34 años,

esto a pesar de que no ha realizado pago alguno por concepto de las deudas hipotecarias desde el año 2016. **La señora Sustache Peña admitió que, entre el verano de 2021, fecha en que el señor Rizer debió adquirir la propiedad y el presente, se ha ahorrado sobre medio millón de dólares en el pago de hipotecas mientras continúa viviendo la propiedad**.

75. Luego del fallecimiento del doctor Martínez Colón, los actos cometidos por sus herederos daban la impresión al señor Rizer que éstos tenían interés en honrar el Contrato y que solo restaba recibir la declaratoria de herederos y el Relevo de Hacienda para otorgar la escritura.

76. **Los demandados nunca comparecieron al cierre de la compraventa según requerido por el señor Rizer y su corredora de bienes raíces, la señora Franceschini**.

77. El señor Rizer se vio forzado a pagar $98,900.00 por concepto de renta como resultado directo de no haber podido adquirir la propiedad según pactado por los demandados ni finiquitar la compraventa.

78. El señor Rizer sufrió angustias mentales consistentes en daño emocional, ansiedad y disputas conyugales al no saber durante varios años si los demandados finalmente cumplirían sus obligaciones contractuales, lo cual lo llevó a retrasar el tener hijos con su esposa y empezar su familia.[26]

En virtud de tales determinaciones, el foro primario concluyó que los Apelantes incumplieron con el contrato de compraventa pactado con el Apelado e incurrieron en dolo contractual. Por lo anterior, decretó que procede el cumplimiento específico del contrato mediante la venta de la propiedad libre de cargas y gravámenes. No obstante, adelantó que, en caso de que el cumplimiento específico no resulte viable procedería acatar la siguiente orden:

> En caso de que el cumplimiento específico no sea viable, sea por determinación del demandante o del acreedor hipotecario, se ordena la indemnización en daños por incumplimiento contractual. Se le ordena a la parte demandada a requerirle a la Sra. Ana Castañer que entregue al Sr. Rizer el depósito por la suma de $80,000.00, más los intereses acumulados, si alguno se haya generado en dicha cuenta. Además, se le ordena a la parte demandada al resarcimiento de los daños y perjuicios resultantes de su incumplimiento contractual al verse impedido el demandante de disfrutar el aumento en el valor de la propiedad frente al precio pactado de venta. Se les ordena a los demandados al pago de la suma de $2,000,000.00 por este concepto. Asimismo, se les ordena a los demandados al pago de $98,900.00 por concepto de renta pagada por el demandante como resultado directo del incumplimiento de los demandados con el Contrato. Se le ordena, también, a los demandados al pago de $15,000.00 por concepto de angustias mentales, las costas, intereses pre-sentencia a

---

[26] SUMAC TPI, Entrada Núm. 241, págs. 7-17.

razón del 8.75% y la cantidad de $15,000.00 por concepto de honorarios por temeridad. La suma total generará intereses legales desde esta fecha hasta que sea satisfecha a razón del 8.75%. Las sumas anteriores representan una obligación solidaria de los codemandados.[27]

Oportunamente, el 13 de julio de 2025, la Parte Apelante sometió *Moción de Reconsideración de Sentencia*. Tras revisar su escrito, el foro primario declaró *No Ha Lugar* dicha petición el 14 de julio de 2025.[28]

Inconformes, el 13 de agosto de 2025, los Apelantes acuden ante nosotros y aducen los siguientes señalamientos de error:

**PRIMER ERROR**: ERRÓ EL FORO RECURRIDO AL DICTAR SENTENCIA RESOLVIENDO QUE LOS DEMANDADOS-APELANTES INCURRIERON EN INCUMPLIMIENTO CONTRACTUAL Y ORDENANDO A LOS DEMANDADOS-APELANTES EL CUMPLIMIENTO ESPECÍFICO DEL CONTRATO O, EN SU DEFECTO, EL PAGO DE LA SUMA DE $2,000,000 AL DEMANDANTE-APELADO RIZER POR LOS DAÑOS Y PERJUICIOS RESULTANTES DEL ALEGADO INCUMPLIMIENTO CONTRACTUAL.

**SEGUNDO ERROR**: ABUSÓ DE SU DISCRECIÓN Y, POR TANTO, ERRÓ EL FORO RECURRIDO AL DICTAR SENTENCIA RESOLVIENDO QUE LOS DEMANDADOS INCURRIERON EN DOLO Y MALA FE EN EL CUMPLIMIENTO DE SU OBLIGACIÓN CONTRACTUAL CON EL DEMANDANTE-APELADO RIZER.

**TERCER ERROR**: ABUSÓ DE SU DISCRECIÓN Y, POR TANTO, ERRÓ EL FORO RECURRIDO AL ORDENARLE A LOS DEMANDADOS-APELANTES EL PAGO DE $15,000 A FAVOR DEL DEMANDANTE-APELADO RIZER POR ANGUSTIAS MENTALES.

**CUARTO ERROR**: ABUSÓ DE SU DISCRECIÓN Y, POR TANTO, ERRÓ EL FORO RECURRIDO AL ORDENARLE A LOS DEMANDADOS-APELANTES EL PAGO DE $98,900 A FAVOR DEL DEMANDANTE-APELADO RIZER POR CONCEPTO DE SU PAGO DE RENTA.

**QUINTO ERROR**: ABUSÓ DE SU DISCRECIÓN Y, POR TANTO, ERRÓ EL FORO RECURRIDO AL IMPONERLE A LOS DEMANDADOS-APELANTES EL PAGO DE $15,000 EN HONORARIOS DE ABOGADOS POR ALEGADA TEMERIDAD.

Sometido su recurso, el señor Rizer radicó *Alegato en Oposición* el 5 de diciembre de 2025. Con el beneficio de la comparecencia de ambas partes, procedemos a exponer la

---

[27] SUMAC TPI, Entrada Núm. 241, pág. 34.
[28] SUMAC TPI, Entradas Núm. 247 y 251.

normativa jurídica aplicable a la controversia ante nuestra consideración.

## II.
### A. Estándar de revisión de apreciación de prueba

En nuestro ordenamiento jurídico, como norma general, los tribunales revisores no intervenimos en la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza ese foro *Sucn. Rosado v. Acevedo Marrero,* 196 DPR 844, 917 (2016). Esta limitación responde al hecho de que "no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos". *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 770 (2013) Así, pues, la "tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada". *Gómez Márquez et al. v. El Oriental,* 203 DPR 783, 792 (2020). Esto "incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Íd.* (citando a *Dávila Nieves v. Meléndez Marín, supra,* pág. 771).

Sin embargo, la deferencia judicial brindada por los foros revisores descansa en un marco de discreción. *Pueblo v. Rivera Montalvo,* 205 DPR 352, 373 (2020). La discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Medina Nazario v. McNeil Healthcare LLC,* 194 DPR 723, 729 (2016). Así que, ese juicio discrecional "no es en función al antojo o voluntad de uno, sin tasa ni limitación alguna". *Pueblo v. Rivera Montalvo,* pág. 373; *Santa Aponte v. Srio. Del Senado,* 105 DPR 750, 770 (1977). Por tanto, los tribunales revisores tenemos facultad para sustituir el criterio que utilizó el foro primario por el nuestro únicamente cuando existen circunstancias extraordinarias en las que se pruebe que el foro primario "actuó con

prejuicio o parcialidad o incurrió en craso abuso de discreción o en error manifiesto". *Citibank et al. v. ACBI et al.,* 200 DPR 724, 736 (2018).

Sobre este aspecto, la jurisprudencia vigente reconoce que un tribunal incurrió en un error manifiesto "cuando, de un análisis de la totalidad de la evidencia, el tribunal apelativo queda convencido de que se cometió un error, aunque haya evidencia que sostenga las conclusiones de hecho del tribunal". *Gómez Márquez et al. v. El Oriental, supra,* pág. 793. Esto implica que "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". *Íd.* Dicho estándar de revisión, "restringe nuestra facultad para sustituir el criterio del foro primario a escenarios en los que de la prueba admitida no exista base suficiente que apoye tal determinación*". Pueblo v. Toro Martínez,* 200 DPR 834, 859 (2018).

Por otro lado, el juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra,* pág. 782. De otra parte, un tribunal puede actuar en abuso de discreción cuando el juez: (1) ignora sin fundamento algún hecho material importante que no podía pasar por alto, (2) concede demasiado peso a un hecho inmaterial y funda su decisión principalmente en ese hecho irrelevante, (3) a pesar de examinar todos los hechos del caso, hace un análisis liviano y la determinación resulta irrazonable. (Citas omitidas). *Pueblo v. Sanders Cordero,* 199 DPR 827, 841 (2018).

### B. Los contratos

El Art. 1042 del Código Civil de Puerto Rico de 1930 ("Código Civil") enumera las fuentes de las obligaciones reconocidas por nuestro ordenamiento jurídico.[29] En específico, el referido artículo dispone que "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia". 31 LPRA ant. sec. 2992.

Sobre las obligaciones de naturaleza contractual, el Art. 1206 del Código Civil, *supra*, establece que un "contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". 31 LPRA ant. sec. 3371. Ahora bien, para que un contrato sea fuente de obligaciones es necesario que concurran los siguientes requisitos, a saber: (1) consentimiento de los contratantes; (2) objeto cierto que sea materia del contrato, y (3) causa de la obligación que se establezca. Arts. 1213 y 1230 del Código Civil, 31 LPRA ant. secs. 3391 y 3451. De concurrir tales criterios, adviene a la vida jurídica una obligación de naturaleza contractual.

En cuanto a este particular, el Artículo 1210 del Código Civil, *supra,* dispone que "[l]os contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". 31 LPRA ant. sec. 3375. Al interpretar el equivalente de este artículo en el Código Civil Español, el tratadista José María Manresa y Navarro explica que "[l]a perfección viene a significar el nacimiento, la aparición del contrato como tal vínculo obligatorio, resultado de la conformidad a que se llega". José M. Manresa, *Comentarios al*

---

[29] Hacemos referencia a las disposiciones del Código Civil (1930) derogado por ser la ley vigente a la fecha que ocurrieron los hechos que hoy se dilucidan.

*Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1967, T. VIII, Vol. II, pág. 434.

Por otro lado, el perfeccionamiento de un contrato es distinguible de su consumación. El primero denota el momento en que el contrato toma vida jurídica, mientras que el segundo "significa su extinción, debida al cumplimiento de las obligaciones que engendró [el contrato]". *Íd.*, pág. 435. Es decir, ambos conceptos aluden a distintas etapas dentro de la vigencia de un contrato. Así pues, una vez el contrato es perfeccionado, se torna obligatorio entre las partes.

En consonancia con lo anterior, es importante establecer que, las relaciones contractuales en nuestra jurisdicción se rigen por el principio de *pacta sunt servanda*. El referido principio, estatuido en el Art. 1044 del Código Civil, *supra*, preceptúa que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de estos. 31 LPRA sec. 2994. En esa dirección, **los tribunales no pueden relevar a una parte de cumplir con lo que se obligó a hacer, mediante contrato, cuando este es legal y válido y no contiene vicio alguno**. *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999).

### C. *El contrato de compraventa*

"Por el contrato de compra y venta uno de los contratantes se obliga entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente". 31 LPRA ant. sec. 3741. Cónsono con esta normativa, se ha categorizado el contrato de compraventa como un negocio jurídico bilateral, el cual crea obligaciones recíprocas. *Martínez v. Colón Franco,* 125 DPR 15, 32 (1989). Este arreglo contractual se formaliza cuando las partes alcanzan un acuerdo en cuanto a la cosa y el precio, "siendo estos últimos los elementos objetivos o reales de dicho contrato". *Bco. Popular v. Registrador*, 181 DPR 663, 672 (2011).

Según discute el tratadista José Manresa, el contrato de compraventa es consensual, y el único requisito para su perfeccionamiento es que haya consentimiento sobre el precio y la cosa. José M. Manresa, *Comentarios al Código Civil Español, op. cit.*, pág. 11. "[B]asta para que exista el contrato de compraventa que recíprocamente se obliguen el vendedor a entregar una cosa determinada y el comprador a pagar por ella un precio cierto, quedando con esto perfecto el contrato, **aun no habiéndose hecho entrega de la cosa y el precio**". *Íd.* (Énfasis nuestro). Por ello, solo se necesita el consentimiento de las partes para que nazcan las respectivas obligaciones.

### D. Incumplimiento contractual y daños ex contractus

Una acción de incumplimiento de contrato le permite a la parte perjudicada solicitar el cumplimento específico de lo pactado o exigir la resolución del contrato e indemnización de daños. *Véase* Artículo 1077, 31 LPRA ant. sec. 3052. "[L]a responsabilidad contractual se basa en el quebrantamiento de un deber que surge de un contrato expreso o implícito". *Rivera Sanfeliz et al. v. Jta. Dir. First Bank*, 193 DPR 38, 56 (2015) (citando a *Soc. de Gananciales v. Vélez & Asoc.*, 145 DPR 508, 521 (1998)).

Al amparo del Artículo 1055 del Código Civil, *supra*, "[l]a responsabilidad procedente del dolo es exigible en todas las obligaciones". 31 LPRA ant. sec. 3019. Por tanto, "[q]uedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas". 31 LPRA ant. sec. 3018. Específicamente, el deudor deberá compensar en daños y perjuicios en el siguiente contexto, de conformidad con el Artículo 1060 de la precitada legislación:

> **Los daños y perjuicios de que responde el deudor de buena fe son los previstos o que se hayan podido prever**

**al tiempo de constituirse la obligación y que sean consecuencia necesaria de su falta de cumplimiento. En caso de dolo responderá el deudor de todos los que conocidamente se deriven de la falta de cumplimiento de la obligación**. (Énfasis nuestro). 31 LPRA ant. sec. 3024.

Cónsono con lo discutido, una acción de daños *ex contractus* es aquella mediante la cual se reclaman daños derivados del incumplimiento contractual. *Maderas Tratadas v. Sun Alliance,* 185 DPR 880, 909 (2012). En esa línea, el Tribunal Supremo de Puerto Rico ha establecido que "estas reclamaciones tienen por objeto que se cumpla con las promesas contractuales sobre las cuales las partes prestaron su consentimiento. Se exige, por lo tanto, que al daño le preceda una relación jurídica entre las partes concernidas". *Íd.* Por último, en caso de incumplimiento contractual, un perjudicado puede: exigir el cumplimiento específico de la obligación o la resolución de este; solicitar el cumplimiento mediante la obtención del equivalente económico de la prestación debida y, a la vez, pedir la indemnización de daños y perjuicios resultantes del incumplimiento. *Master Concrete Corp. v. Fraya, S.E.,* 152 DPR 616, 625 (2000).

### *E. El dolo contractual*

En nuestro estado de derecho, el dolo puede manifestarse en dos (2) etapas distintas del curso de los negocios jurídicos, a saber: (1) en el origen o la formación de estos, tomando la forma de un vicio de consentimiento y (2) en la ejecución de las obligaciones ya existentes. *Colón v. Promo Motor Imports, Inc.*, 144 DPR 659, 668-9 (1997). En cuanto al segundo, "surge, no en la etapa de la contratación, sino en el curso de la consumación del contrato" y "consiste en la omisión consciente, intencionada y voluntaria de eludir el cumplimiento de la obligación, con conocimiento de que se realiza un acto injusto". *Íd.*, pág. 668.

Ahora bien, el dolo no se presume, por lo cual, no se puede establecer mediante meras alegaciones, sino "corresponde a quien

reclama dicha conducta dolosa la responsabilidad de la prueba". *Mayagüez Hilton Corp. v. Betancourt,* 156 DPR 234, 253 (2002). En tal sentido, el Tribunal Supremo de Puerto Rico ha precisado que la determinación de dolo es "**una cuestión de hecho que no se sustenta con la mera alegación del reclamante, sino que hace falta aportar prueba, la cual deberá ser valorada exclusivamente por el juez de instancia**". *Íd.* (Énfasis nuestro).

### F. *Daños por angustias mentales*

Nuestro ordenamiento jurídico reconoce que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". 31 LPRA ant. sec. 5141. Por consiguiente, una acción de daños requiere que concurran tres requisitos, a saber: (1) tiene que haber un daño real; (2) debe existir nexo causal entre el daño y la acción u omisión de otra persona, y (3) el acto u omisión tiene que ser culposo o negligente. *López v. Porrata Doria,* 169 DPR 135, 150 (2006) (citando a *Bonilla v. Chardón,* 118 DPR 559, 610 (1987)).

Ahora bien, el concepto de daño se entiende como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". *Sagardía de Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484, 505 (2009). En ese sentido, nuestro más Alto Foro ha precisado la división existente entre los daños patrimoniales y los no patrimoniales. *Rivera v. S.L.G. Díaz,* 165 DPR 408, 428 (2005). Así, pues, el daño patrimonial es aquel menoscabo valorable en dinero sobre el patrimonio de la persona que ha sido perjudicada. *Sagardía de Jesús v. Hosp. Aux. Mutuo, supra,* pág. 506. Por otro lado, el daño no patrimonial es aquel que en principio "no tiene base equivalencial que caracteriza a los patrimoniales, por afectar precisamente a elementos o intereses de difícil valoración pecuniaria". *Íd.* (citando a

J. Santos Briz, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 2003, T. III, pág. 460).

Como parte de los daños no patrimoniales, se desprenden los daños morales los cuales son los "infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado". *Rivera v. SLG Díaz, supra*, pág. 428 (2005). El Tribunal Supremo de Puerto Rico ha establecido que este concepto es amplio y abarca distintitas vertientes de la naturaleza del ser humano que van desde "el dolor físico o corporal, las angustias mentales, hasta los daños o las lesiones corporales". *Sagardia De Jesús v. Hosp. Aux. Mutuo, supra*, pág. 507.

En consecuencia, nuestro ordenamiento jurídico reconoce que las angustias mentales presuponen la concesión de un daño. *Cintrón Adorno v. Gómez,* 147 DPR 576, 597 (1999). Aquellas partidas que vayan dirigidas a indemnizar esas angustias *y* sufrimiento mentales tienen como finalidad remediar el dolor y los sufrimientos tanto físicos como mentales que padece una persona como consecuencia de un acto culposo o negligente. *Íd.*

Para que una reclamación de este tipo proceda, es imprescindible probar sufrimientos y angustias morales profundas. *Rivera v. S.L.G. Díaz, supra*, pág. 432. Por consiguiente, es necesario que la parte afectada presente prueba para que el juzgador pueda determinar el valor razonable de los daños morales, probando que no se trata de una simple pena pasajera. *Íd.*

### G. Temeridad

La Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1(d), otorga a los tribunales la facultad de imponer honorarios de abogado, en caso de que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad. 32 LPRA Ap. V, R. 44.1(d). Puesto que la determinación de "si ha mediado o no temeridad recae sobre la sana discreción del tribunal

sentenciador[,] solo se intervendrá con ella en casos en que ese foro haya abusado de tal facultad". *Maderas Tratadas v. Sun Alliance* et al., *supra,* pág. 926.

El concepto de temeridad se ha descrito como uno amplio. *Torres Montalvo v. Gobernador ELA,* 194 DPR 760, 778 (2016). De conformidad con lo anterior, el Tribunal Supremo ha establecido que la temeridad constituye aquel comportamiento que incide en los procesos judiciales y afecta, tanto el buen funcionamiento de los tribunales, como la administración de la justicia. *Íd.* Por tanto, su imposición sirve como una penalidad cuando la parte actúa con "terquedad, obstinación, contumacia e insistencia", particularmente, cuando "en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". *Íd.*

A modo ilustrativo, nuestro Máximo Foro ha considerado las siguientes circunstancias como temeridad, a saber:

> (1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (2) defenderse injustificadamente de la acción; (3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad, y (5) negar un hecho que le conste es cierto a quien hace la alegación. *C.O.P.R. v. S.P.U.,* 181 DPR 299, 342 (2011). (Cita omitida).

De manera similar, el Tribunal Supremo de Puerto Rico ha reconocido que existe temeridad cuando una parte: (1) insiste en alegar algo sin alguna prueba fehaciente, (2) niega los hechos que le constan o son de fácil corroboración y (3) dilata los procedimientos judiciales para no responder por sus obligaciones. *Consejo Titulares v. MAPFRE,* 2024 TSPR 140, 215 DPR ___ (2024); *SLG González-Figueroa v. SLG et al,* 209 DPR 138, 149-150 (2022). No obstante, esta no es una lista taxativa, pues la determinación de temeridad descansa en la discreción del tribunal, al considerar los siguientes

factores, a saber: (1) el grado de temeridad; (2) el trabajo realizado; (3) la duración y naturaleza del litigio; (4) la cuantía involucrada, y (5) el nivel profesional de los abogados. *Íd.*, págs. 342-343 (citando a R. Hernández Colón, *Derecho Procesal Civil*, San Juan, Ed. LexisNexis, 2010, Sec. 4402).

Ahora bien, la imposición de honorarios de abogado no procede en todos los casos. *PR Fast Ferries et al. v. AAPP,* 213 DPR 103, 115 (2023). Por tanto, su concesión está limitada a la determinación de temeridad o frivolidad por parte del tribunal, según lo establece la Regla 44(d) de Procedimiento Civil, *supra.* Así que, la imposición de honorarios no opera automáticamente, puesto que depende de la determinación discrecional que haga el tribunal en torno a si la parte perdidosa o su abogado actuó con temeridad o frivolidad. *PR Fast Ferries et al. v. AAPP, supra*, pág. 115. En ese sentido, la jurisprudencia vigente establece que no existe temeridad cuando el litigante actúa, a la luz de una apreciación errónea de una cuestión de derecho, y no hay precedentes sobre la cuestión, o cuando existe alguna desavenencia honesta en cuanto a quién favorece el derecho aplicable según los hechos del caso. *Consejo Titulares v. MAPFRE, supra* (citando a *Oliveras, Inc. v. Universal Ins. Co.,* 141 DPR 900, 936 (1996)). Tampoco procede la concesión de honorarios en aquellos litigios que encierran planteamientos complejos y novedosos aun no resueltos en nuestra jurisdicción. *Meléndez Vega v. El Vocero De PR*, 189 DPR 123, 212 (2013); *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 926 (2012).

**III.**

En el recurso de epígrafe, los Apelantes argumentan que no incurrieron en incumplimiento contractual y dolo. Por tanto, sostienen que el foro primario incidió al imponer el pago en concepto daños por angustias mentales y al ordenarles compensar al Apelado por los gastos asumidos en cuanto a la renta de unas propiedades

inmuebles. Por último, también arguyen que el foro *a quo* erró al concluir que desplegaron una conducta temeraria. En vista de ello, nos peticionan la revocación de la *Sentencia* apelada.

En oposición, el señor Rizer nos invita a confirmar el dictamen impugnado. Alega que los Apelantes se obligaron a venderle una propiedad inmueble, y este acordó comprarla. Sin embargo, sostiene que estos no actuaron con diligencia para completar el proceso de la compraventa, según estipulado por ambas partes. Por lo que, argumenta que incurrieron en incumplimiento contractual y dolo.

Luego de un análisis sosegado del recurso presente, a la luz del estado de derecho vigente al momento de los hechos, determinamos que el foro primario actuó correctamente al resolver que la Parte Apelante incurrió en incumplimiento contractual. Adelantamos que el dictamen aquí cuestionado descansa en la totalidad de la prueba desfilada en la celebración del juicio, y a su vez, es consistente con el derecho discutido en el acápite anterior. Veamos.

En el señalamiento de error (1), los Apelantes arguyen que el foro *a quo* incidió al determinar que estos incurrieron en incumplimiento contractual. En aras de prevalecer en su contención, indican que los atrasos en la consumación del contrato no constituyen incumplimiento contractual. Aseveran que no se celebró la transacción final porque el negocio jurídico estaba condicionado a la aprobación de un *short sale*. No les asiste la razón.

Surge del expediente ante nuestra consideración que, las partes pactaron un contrato de compraventa el 9 de octubre de 2020, cuyos términos son claros y no se prestan para interpretaciones arbitrarias e irrazonables. Particularmente, dicho arreglo contractual establece la siguiente obligación:

> **The undersigned MANUEL MARTÍNEZ and EDDA SOUSTACHE [sic] ("the SELLERS") agree to sell, and the Undersigned ALAN THEODORE RIZER and MARIA**

> *GABRIELA CORDOBA ARIAS (the "BUYERS") agree to buy, the property located at 513 Tintillo Hills Road, Guaynabo, PR 00966 (the "Property").*
>
> *The BUYERS accept to buy the Property in "as is where is condition.*[30] (Énfasis nuestro).

De expediente se desprende, además que, la compraventa se acordó por el precio cierto de dos millones de dólares ($2,000,000.00).[31] A tales efectos, la cláusula seis (6) del aludido contrato dispone que los vendedores tendrán la obligación de entregar la propiedad libre de deudas y gravámenes, según se esboza a continuación:

> *SELLERS will transfer to BUYERS the Property described above, free of any liens or debts, including but not limited to, Property taxes (CRIM), Home Owner's Association Dues, all electric and water charges accrued, etc. Transfer of property will be done according to Puerto Rico law.*[32] (Énfasis nuestro).

Por su parte, la cláusula cinco (5) del referido contrato prescribe que ambas partes se comprometerán a actuar de manera diligente y en el mejor interés para completar la transacción:

> *Parties agree and understand that unforeseen delays may occur, but that they will act diligently and in the best interest in completing the transaction. Possession shall be given to BUYER within 15 days from the day of the closing, unless otherwise agreed in writing by both parties. SELLERS will pay BUYERS a prorated fee from the monthly payment of the mortgage and maintenance (HOA) expense from the closing until the date the Property is actually transferred to the BUYERS.*[33] (Énfasis nuestro).

A la luz de lo anterior, concluimos que no surge del aludido contrato, ni de las extensiones firmadas por las partes que la venta estuviera sujeta a la aprobación de un *short sale* ante el Banco Popular.[34] En consecuencia, razonamos que, ante la ausencia de dicha condición, los Apelantes incurrieron en incumplimiento contractual, pues no procedieron de manera diligente y de buena fe

---

[30] Entrada Núm. 228 SUMAC TPI, Anejo I, Exhibit 1 (Estipulado).
[31] *Íd.*
[32] *Íd.*
[33] *Íd.*
[34] Íd. Anejos II, III, y IV, Exhibits 2, 3, 4, 5, (Estipulados).

para acatar los términos, según estipulados en el contrato en cuestión.

Por cierto, notamos que, para justificar su dilación, la Parte Apelante aduce que su demora se produjo por el retraso en la expedición del *Relevo de Cancelación de Gravamen* ante el Departamento de Hacienda. En otras palabras, razonan que su dilación no responde al incumplimiento contractual señalado, sino a causas ajenas a su voluntad. No obstante, luego de examinar con sumo cuidado la totalidad del expediente, colegimos que esta alegación tampoco se sustenta por la prueba que describimos a continuación.

Consta en el expediente ante nos que, los Apelantes no desplegaron la diligencia requerida para completar la transacción, de conformidad con la cláusula cláusula cinco (5) del referido contrato. Así pues, no actuaron de manera oportuna en la tramitación del *Relevo de Cancelación de Gravámenes*, lo cual impidió que se celebrara el cierre de la compraventa pactada. Así, pues, la *Certificación del Departamento de Hacienda* nos revela que la Parte Apelante inició los trámites ante la aludida agencia el 27 de octubre de 2021, es decir, seis (6) meses y veintiséis (26) días, luego de haber recibido la Declaratoria de Herederos.[35] Asimismo, dicha *Certificación* devela también que los Apelantes abandonaron el proceso, por lo cual tuvieron que reiniciar el trámite el 15 de julio de 2023.[36] Ante tal contexto, reiteramos que no se encontraban a la merced del Departamento de Hacienda, sino que no procedieron diligentemente ante dicho foro administrativo para garantizar el

---

[35] *Sentencia,* pág. 15. Ver también SUMAC TPI, Entrada Núm. 228, Exhibit 6 Estipulado ("El 27 de octubre de 2021 comenzaron a completar la Planilla Informativa de caudal Relicto para el causante Manuel Martínez Colón").

[36] SUMAC TPI, Entrada Núm. 228, Exhibit 6 Estipulado ("Ante esta situación el usuario debe comenzar nuevamente el proceso de radicación de la planilla, cumpliendo con todos requisitos establecidos. El 15 de julio de 2023 crean nuevamente el borrador de la planilla").

cumplimiento del acuerdo contractual pactado con el señor Rizer.[37] Según reseñamos, la conducta adoptada por los Apelantes impidió que se celebrara el cierre de la compraventa. Por consiguiente, puntualizamos que no estamos ante una dilación proveniente de causas ajenas a la voluntad de los Apelantes. Al contrario, ha quedado demostrado que, estos no actuaron con la diligencia, según pactada en el contrato, debido a que iniciaron tardíamente el proceso para obtener el *Relevo de Cancelación de Gravámenes.*

En consideración a tales circunstancias, la cláusula (10) del contrato establece que el señor Rizer tiene derecho a requerir el cumplimiento específico del arreglo contractual y solicitar indemnización en concepto de daños y perjuicios, tal como se detalla a continuación:

> **If BUYERS are ready, willing and able to execute the deed of sale and other closing documents and to pay the cash portion of the purchase price and other adjustments provide for above, but the SELLERS do not execute the deed of sale, the BUYERS shall have the right to specific performance of this contract plus damages, if any, or at their option, cancel this contract and receive the earnest money as total compensation. In either case, SELLERS shall remain liable to pay the broker(s) the full commission provided herein.**[38] (Énfasis nuestro).

A esos efectos, contemplamos que, el foro primario recibió prueba testimonial y documental que demostró que el Apelado cumplió con sus obligación contractual, pues obtuvo el financiamiento necesario para adquirir la propiedad inmueble.[39] Así se evidenció mediante el testimonio de la Sra. Nicole Franceschini, corredora de bienes raíces, quien constató que este obtuvo el financiamiento correspondiente.[40] Sin embargo, la prueba presentada, también evidenció que los Apelantes, en cambio, no acataron su obligación e impidieron la celebración de la fase final de

---

[37] *Sentencia,* pág. 13, pár. 49.
[38] SUMAC TPI, Entrada Núm. 228, Exhibit 1, cl. 10.
[39] *Sentencia,* pág. 12, pár. 45 y 46.
[40] *Véase,* Regrabación Juicio, 19 de mayo de 2025, del min. 49:45 a 51:18. También ver Regrabación Juicio, 20 de mayo de 2025, del min. 12:00 a 12:55. *Véase,* también, SUMAC TPI, Entrada Núm. 228, Exhibits 21 y 22 de la parte Demandante.

la compraventa. A la luz de lo dispuesto, concluimos que el foro primario no incurrió en prejuicio, parcialidad, abuso de discreción o error manifiesto respecto a esta conclusión, la cual está fundamentada en la totalidad de la prueba que tuvo ante su consideración. Por tanto, nos compete ser deferentes frente al ejercicio de la apreciación de la prueba asumido por el tribunal sentenciador, el cual le condujo a determinar que los Apelantes incumplieron su obligación contractual. Por tanto, colegimos que el primer señalamiento de error no se cometió.

Resuelto lo anterior, procedemos a atender el señalamiento de error (2), en el cual la Parte Apelante alega que el foro *a quo* incidió al determinar que incurrió en dolo contractual y mala fe. Nuevamente, no le asiste la razón. Recordemos pues, que, el dolo puede manifestarse en dos (2) etapas distintas del curso de los negocios jurídicos, a saber: (1) en el origen o la formación de estos, tomando la forma de un vicio de consentimiento y (2) en la ejecución de las obligaciones ya existentes. *Colón v. Promo Motor Imports, Inc.*, *supra*, pág. 668-669. Respecto a este último, enfatizamos que, "**surge, no en la etapa de la contratación, sino en el curso de la consumación del contrato**" **y** "**consiste en la omisión consciente, intencionada y voluntaria de eludir el cumplimiento de la obligación, con conocimiento de que se realiza un acto injusto**". *Íd.*, pág. 668. (Énfasis nuestro).

A tenor con la normativa esbozada, observamos que, el foro primario les imputó a los Apelantes el dolo contractual que se manifiesta en el curso de la consumación del contrato. De acuerdo con la prueba presentada, la Parte Apelante procedió de modo descuidado en la tramitación del *Relevo de Cancelación de Gravámenes*, y, además, no mantuvo adecuadamente informado al

señor Rizer respecto a este a asunto.[41] De hecho, durante el trascurso del año 2021, los Apelantes le manifestaron a la Parte Apelada que se encontraban en la espera de que el Departamento de Hacienda atendiera la solicitud de su trámite. Sin embargo, estos ni siquiera habían iniciado el proceso ante dicha agencia.[42] No obstante, próximo a culminar ese año, la Parte Apelante comenzó los trámites ante la aludida agencia el 27 de octubre de 2021, seis (6) meses y veintiséis (26) días, luego de haber recibido la Declaratoria de Herederos.[43] A su vez, la prueba presentada constató que el proceso ante el Departamento de Hacienda no se completó inicialmente por la falta de iniciativa de los solicitantes. Por consiguiente, ante su inacción, el trámite administrativo se reinició el 15 de julio de 2023, lo cual impidió la consumación del contrato objeto del litigio.[44]

Ahora bien, somos conscientes de que tales circunstancias no son las únicas que evidencian dolo contractual por parte de los Apelantes.  En un intento de prevalecer en la contienda legal, estos sostienen que el foro *a quo* identificó erróneamente que incurrieron en dolo al pretender vender la propiedad inmueble a un precio mayor al pactado. Para refutar dicha conclusión, alegan que la aprobación del *short sale* había expirado, por lo que, razonan que el precio de la venta quedó sujeto a la tasación que ordenase la institución bancaria financiera. Sin embargo, tras evaluar la totalidad de la prueba, no identificamos prueba que nos permita acoger tal argumento.

---

[41] *Sentencia*, pág. 24.

[42] *Sentencia*, págs. 13-15. *Véase,* también, SUMAC TPI, Entrada Núm. 228, Exhibit 17 Demandante (correo electrónico notificando que habían recibido la Declaratoria de Herederos, por lo cual podían iniciar los trámites con Hacienda), Exhibit 23 Demandante (correo electrónico donde afirman que "esperan recibir el Relevo pronto") y Exhibit 5 Estipulado (carta donde la Sra. Sustache manifiesta que tienen el interés de vender la casa y que están a la espera de Hacienda).

[43] *Sentencia,* pág. 15. *Véase,* también SUMAC TPI, Entrada Núm. 228, Exhibit 6 Estipulado ("El 27 de octubre de 2021 comenzaron a completar la Planilla Informativa de caudal Relicto para el causante Manuel Martínez Colón").

[44] SUMAC TPI, Entrada Núm. 228, Exhibit 6 Estipulado.

En primer lugar, destacamos que, el tribunal *a quo* tuvo ante sí evidencia documental y oral, la cual demostró que la cuantía acordada sobre la compraventa correspondió a una serie de negociaciones gestionadas por las partes.[45] Así lo corroboró particularmente el testimonio del Sr. Rizer, el cual mereció entera credibilidad por parte del foro primario.[46]. En segundo lugar, puntualizamos que, celebradas tales negociaciones, el contrato en cuestión se pactó por el precio cierto de dos millones de dólares ($2,000,000.00).[47] Por tanto, una lectura cuidadosa del arreglo contractual nos permite concluir que el precio estipulado por las partes no estaba limitado a las condiciones impuestas por una institución financiera, ni tampoco estaba sujeto a otras consideraciones no contempladas en el referido contrato.

Asimismo, resaltamos que, ante el foro primario el Apelado declaró que intentó finiquitar la transacción, luego de la expedición de Relevo de *Relevo de Cancelación de Gravámenes*. Sin embargo, este testificó que los Apelantes le indicaron que el precio de la compraventa ya no sería por la cantidad pactada.[48] Ciertamente, lo anterior es reflejo del comportamiento constitutivo de dolo contractual, exhibido por la Parte Apelante, para eludir de manera intencional el cumplimiento de su obligación contractual, en evidente contravención del principio de buena fe imperante en nuestro ordenamiento jurídico.[49] En consecuencia, concluimos que tampoco se cometió el segundo error.

---

[45] *Sentencia*, pág. 9. *Véase*, además., Regrabación Juicio, 19 de mayo de 2025, del minuto 40 hasta el minuto 42.

[46] *Íd.*

[47] SUMAC TPI, Entrada Núm. 228, Exhibit 1 Estipulado.

[48] *Sentencia*, en las págs. 16-7. *Véase*, también Regrabación, Juicio 19 de mayo de 2025, del 2:23:40 hasta el 2:24:05.

[49] El tratadista Manresa nos recuerda que el dolo "no exige que el agente quiera el resultado por el daño o el perjuicio que causare, bastando con que no le importe que se produzca, con tal de obtener las ventajas del incumplimiento, siempre que realice los actos u omisiones precisos, con conciencia de la producción del mal". José M. Manresa, *Comentarios al Código Civil Español*, op. cit., pág. 213.

Atendido lo anterior, nos compete discutir los señalamientos de error (3) y (4), por estar intrínsecamente relacionados. En virtud de estos, los Apelantes aducen que el foro primario erró al imponerles el pago de quince mil dólares ($15,000.00), producto de las angustias mentales sufridas por el Apelado, más noventa y ocho mil, novecientos dólares ($98,900.00), en concepto de las rentas asumidas por el Apelado como consecuencia del incumplimiento contractual. En cuanto a la partida por angustias mentales, consideran que no se probó la existencia de los daños, puesto que la Parte Apelada compró tres (3) residencias desde el 2022.

Evaluado con detenimiento el expediente, determinamos que el Apelado demostró, mediante prueba suficiente, que experimentó daños y angustias mentales como consecuencia directa del incumplimiento contractual provocado por la Parte Apelante a finales de los años 2020 y 2022. Surge particularmente del expediente que, el Sr. Rizer sufrió los daños derivados del incumplimiento contractual durante el periodo previo al año 2023. Al respecto, conviene destacar el siguiente pronunciamiento emitido por el foro primario en atención a los daños sufridos por dicha parte:

> **[E]l Tribunal considera probado el sufrimiento de angustias mentales por parte del demandante. El testimonio del señor Rizer fue convincente y demuestra que experimentó ansiedad, incertidumbre emocional y afectaciones a su proyecto de vida familiar a raíz del prolongado incumplimiento por parte de los demandados. La evidencia establece que esta situación lo llevó a posponer la planificación de su familia, generando un desgaste emocional significativo durante varios años. Según el testimonio creído por este Tribunal, el Sr. Rizer no meramente sufrió de una pena pasajera. Estuvo años en la incertidumbre continua de esperar por los demandados para comprar lo que sería su vivienda familiar.**[50] (Énfasis nuestro).

Por tanto, examinada con sumo cuidado la totalidad de la prueba presentada ante nos, resolvemos que, no identificamos evidencia que contradiga esta determinación. En efecto, estamos

---

[50] *Sentencia*, pág. 25.

impedidos de sustituir el criterio adoptado por el foro *a quo*, por lo que, no revocaremos la partida concedida en concepto de daños y perjuicios, derivada del incumplimiento contractual.

En esa misma línea, notamos que los Apelantes indican que el foro primario incidió al otorgar una partida por el pago de rentas de unas propiedades sin precisar adecuadamente el periodo de tales gastos. A su vez, arguyen que el tribunal sentenciador erró al dictaminar que el señor Rizer se vio forzado a pagar noventa y ocho mil novecientos dólares ($98,900.00) en concepto de renta, como resultado directo de no haber adquirido la propiedad.

En atención a este argumento, reconocemos, como bien señalan los Apelantes que el foro primario no delimitó el periodo por el cual el Apelado recibiría la compensación en concepto de las rentas, lo cual le condujo erróneamente a imponer contra estos una suma excesiva noventa y ocho mil novecientos dólares ($98,900.00). Por tanto, debemos pronunciarnos al respecto. A esos efectos, precisamos que, el testimonio del Sr. Rizer y los documentos presentados evidencian que el Apelado se vio obligado a gastar cincuenta un mil quinientos dólares ($51,500.00), durante los periodos de 12 de enero de 2021 y el 11 de marzo de 2022, como resultado de las transacciones provenientes de las rentas de unas propiedades inmuebles.[51]

**Ante tales circunstancias, debemos reducir de la partida global de noventa y ocho mil novecientos dólares ($98,900.00), los cuarenta y siete mil cuatrocientos dólares ($47,400.00), asumidos por el Apelado el 31 de marzo de 2023, en virtud de un contrato de arrendamiento de una propiedad en Guaynabo.[52] Ello, pues, tal gasto no guarda relación con las consecuencias**

---

[51] SUMAC TPI, Entrada Núm. 228, Exhibit 7 Demandante. *Véase*, también Regrabación Juicio, 19 de mayo de 2025, del min. 19:30 a 20:03 y 2:32:40 a 2:34:16.
[52] SUMAC TPI, Entrada Núm. 228, Exhibit 8 Demandante.

**derivadas del incumplimiento contractual imputado a los Apelados.[53] Por consiguiente, eliminada tal partida, la Parte Apelante deberá pagar cincuenta un mil quinientos dólares ($51,500.00), correspondiente a los periodos aludidos, los cuales están directamente relacionados con el incumplimiento contractual.**

Por último, debemos atender el señalamiento de error (5). En virtud de este, los Apelantes argumentan que el foro primario erró al imponerles una sanción de $15,000.00 por temeridad. Aducen que la determinación de temeridad se fundamentó principalmente en su desistimiento de la reconvención. De nuevo, no les asiste la razón.

Tras un examen detenido del historial procesal que rodea al caso de epígrafe, colegimos que la determinación del tribunal sentenciador respondió a una serie de elementos debidamente precisados, constitutivos de temeridad, concernientes a la conducta desplegada por los representantes legales de la Parte Apelante. Así, pues, notamos que, los Apelantes peticionaron inicialmente una orden protectora para impedir que se descubrieran los trámites realizados ante el Departamento de Hacienda. A su vez, observamos que, solicitaron que se revocara la anotación preventiva de embargo. Sin embargo, advertimos que tal solicitud, a todas luces resultaba improcedente, pues solo constaba ante el Registro de la Propiedad una anotación preventiva de demanda, es decir, nunca estuvo inscrita una anotación de enajenación en su contra. A pesar de lo anterior, los Apelantes insistieron en continuar su reclamación desprovistos de fundamentos válidos.[54]

---

[53] Véase, Regrabación Juicio, 19 de mayo de 2025, del 3:43:54 a 3:44:50.

[54] Como bien señala el foro primario en la Sentencia impugnadas, no es la presentación de estos recursos de por sí lo que representa la conducta temeraria, sino que, lo que

> [R]esulta temerario es insistir en sus argumentos durante todo el transcurso del litigio, forzando al demandante a incurrir en

Igualmente, destacamos que, los Apelantes incurrieron en temeridad en la etapa del descubrimiento de prueba. Por ende, acogemos el razonamiento brindado por el foro *a quo*, en atención a la conducta desplegada durante la celebración de dicho proceso:

> **[E]l curso de acción adoptado por los demandados deliberadamente también demuestra temeridad procesal. Su negativa injustificada a cumplir el Contrato, su cambio de postura una vez el bien aumentó de valor, y su alegación infundada de que el Contrato había expirado desde antes de que ellos lo ratificaran por escrito en varias ocasiones, provocaron innecesariamente este litigio.**[55]

Cónsono con lo antes expuesto, concluimos que el comportamiento contumaz y obstinado desplegado por la Parte Apelante generó una dilación injustificada de los trámites judiciales, e implicó una serie de gastos innecesarios sobre la Parte Apelada. Por consiguiente, debemos sostener la cuantía impuesta en concepto de honorarios por temeridad.

**IV.**

**Por los fundamentos que anteceden, *modificamos* el dictamen apelado a los únicos fines de reducir la partida concedida, en concepto de rentas, a cincuenta y un mil quinientos dólares ($51,500.00), para que así refleje exclusivamente los gastos asumidos por el señor Rizer durante los periodos del 12 de enero de 2021 y el 11 de marzo de 2022, como consecuencia directa del incumplimiento contractual de la Parte Apelada.[56] Así modificada, *confirmamos* la *Sentencia* en sus demás extremos, toda vez que no reviste abuso de discreción, prejuicio, parcialidad, error manifiesto, por parte del Tribunal de Primera Instancia.**

---

honorarios de abogado y gastos para presentar múltiples mociones y escritos apelativos y ante este foro de primera instancia para luego, al final del juicio, solicitar al Tribunal desistir con perjuicio de su Reconvención·

[55] *Íd.*, pág. 32.
[56] SUMAC TPI, Entrada Núm. 228, Exhibit 7 Demandante. Véase, también Regrabación Juicio, 19 de mayo de 2025, del min. 19:30 a 20:03 y 2:32:40 a 2:34:16.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones